UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | Case No. 3:23-cr-00006-MMD-CSD |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| COLBY VEGA ALVAREZ-MORA, | |
| Defendant. | |

**I.    SUMMARY**

Defendant Colby Vega Alvarez-Mora has been indicted on one count of being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Alvarez-Mora filed a motion to dismiss his indictment ("Motion"), contending the underlying statute violates the Second Amendment.[1] (ECF No. 28.) The Court will deny Alvarez-Mora's Motion because Ninth Circuit precedent deciding this issue has not been abrogated and, alternatively, the history and tradition of this nation's firearms regulation supports disarming persons convicted of felony offenses.

**II.   BACKGROUND**

On March 2, 2023, a federal grand jury indicted Alvarez-Mora on one count of possessing a firearm as a prohibited person in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). (ECF No. 1 ("Indictment").) The Indictment alleges that Alvarez-Mora knowingly possessed a pistol despite having been convicted of a crime punishable by imprisonment for a term longer than one year. (*Id.*)

/ / /

/ / /

---

[1]The Court has reviewed the parties' response and reply. (ECF Nos. 30, 31.)

## III. DISCUSSION

Alvarez-Mora moves to dismiss the charge against him on the grounds that that 18 U.S.C. § 922(g)(1) fails the 'historical tradition' test articulated in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and thus violates the Second Amendment. (ECF No. 28.) Under Section 922(g)(1), it is unlawful for "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting commerce, any firearm." 18 U.S.C. § 922(g)(1). Such restrictions on access to firearms must be assessed against the Second Amendment right to "keep and bear arms." U.S. CONST. amend II.

In the wake of the Supreme Court's 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), circuit courts convened upon a two-step test for determining whether arms regulations violate the Second Amendment. *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013). The Supreme Court in *Bruen* recently shortened and clarified that test, in large part by discarding its second step. *See* 597 U.S. at 17-19. Now, courts must first determine the threshold matter of whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct." *Id.* at 17. A regulation of protected conduct may still be upheld if the government can demonstrate that it is "consistent with this Nation's historical tradition of firearm regulation." *Id.* Even under this revised framework, Section 922(g)(1) passes constitutional muster.

### A. Abrogation of Ninth Circuit Caselaw

The Ninth Circuit has repeatedly upheld Section 922(g)(1) against Second Amendment challenges. *See, e.g.*, *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). However, since those opinions were published, the Supreme Court invalidated part of the circuit court's prior test for assessing constitutionality under the Second Amendment. *See Bruen*, 597 U.S. at 18-19. Alvarez-Mora now contends that the new *Bruen* test is so fundamentally different from the Ninth Circuit's previous approach that those prior rulings

on Section 922(g)(1) have been abrogated. (ECF No. 28 at 2-4.)

Where the reasoning or theory of prior Ninth Circuit authority is "clearly irreconcilable with the reasoning or theory of intervening higher authority," district courts must consider themselves bound by the intervening authority and reject the prior Ninth Circuit opinions as "effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (en banc), *overruled on different grounds as recognized in Hernandez v. Garland*, 47 F. 4th 908, 910 (9th Cir. 2022). The 'clearly irreconcilable' requirement is a high bar. *See Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012); *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018). It is not enough for the intervening authority to have some tension with or to cast doubt on the prior circuit precedent; rather, prior circuit opinions remain in effect if they can apply without "running afoul of the intervening authority." *Lair*, 697 F.3d at 1207 (quotation marks omitted); *see also Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (focusing on whether intervening authority "so undercuts the principles on which [a Ninth Circuit case] relied that our prior decision cannot stand").

Applying these principles here, it is clear that *Bruen* is not clearly irreconcilable with the Ninth Circuit Section 922(g)(1) cases determined on the basis of the first step of the since-overturned circuit court test. After *Heller*, circuit courts, including the Ninth Circuit, employed a two-step test that first looked to history and the Second Amendment's text "to determine whether the challenged law burdened conduct protected by the Second Amendment," and, if so, "then applied the appropriate level of scrutiny." *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (cleaned up); *see also Bruen*, 597 U.S. at 18-19. The *Bruen* majority noted that its 'new' test was the same as the one set forth in *Heller*—and that this approach was "broadly consistent" with step one of the circuit courts' former test. *Bruen*, 597 U.S. at 19, 26; *see also Lair*, 697 F.3d at 1207 (precedent was not abrogated where the intervening authority clarified and reinforced the principles upon which the prior opinions relied). Thus, to the extent that the Ninth Circuit Section 922(g)(1) cases rely upon the first step of the defunct test, they do not obviously contradict, and may even be

consistent with, *Heller* and *Bruen*.

The Ninth Circuit's previous opinions have addressed both the text of the Second Amendment and the historical tradition of firearms regulation in assessing the constitutionality of felon-in-possession prohibitions. In *United States v. Vongxay*, the Ninth Circuit found that "felons are categorically different from the individuals who have a fundamental right to bear arms," suggesting that the text of the Second Amendment does not extend to anyone with a felony conviction. 594 F.3d at 1115; *accord id.* at 1115 n.1 (noting that Justice Stevens' dissent underscored that the *Heller* majority limited the Second Amendment's protected class to "law abiding, responsible citizens").

Ninth Circuit precedent on the history and tradition of felon-in-possession bans also lends toward upholding Section 922(g)(1). The Ninth Circuit has recognized that the historical longevity of felon firearm bans "has not been definitively resolved." *Vongxay*, 594 F.3d at 1118; *accord Phillips*, 827 F.3d at 1174 n.2. But in *Vongxay*, the Ninth Circuit examined the historical record and found that felons "historically have been explicitly prohibited from militia duty" and

> most scholars of the Second Amendment agree that the right to bear arms was inextricably tied to the concept of a virtuous citizenry that would protect society through defensive use of arms against criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e.[,] criminal).

*Vongxay*, 594 F.3d at 1117-18 (cleaned up). Even *Heller* noted that prohibitions on the possession of firearms by felons were "longstanding" and thus "presumptively lawful." 554 U.S. at 626-27 & n.26. The Court is "not empowered to disregard this binding precedent." *United States v. Butts*, 637 F. Supp. 3d 1134, 1138 (D. Mont. 2022). Though Alvarez-Mora has identified "some tension" between *Bruen* and the Ninth Circuit Section 922(g)(1) cases, *Lair*, 697 F.3d at 1207, that tension is not so great that prior Ninth Circuit decisions "cannot stand," *Rodriguez*, 728 F.3d at 979; *accord Butts*, 637 F. Supp. 3d at 1138; *United States v. Gamble*, __ F. Supp. 3d. __, No. 2:22-CR-00267-JAD-EJY, 2023 WL 6460665, at *3 (D. Nev. Oct. 4, 2023); *United States v. Roberts*, __ F. Supp. 3d. __, No. 3:23-CR-00057-TMB-KFR-1, 2024 WL 50889, at *6 (D. Alaska Jan. 4, 2024); *cf. Teter v. Lopez*,

4

76 F.4th 938, 947, 950 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024) (opinions upholding arms regulations at the heightened scrutiny step were abrogated by *Bruen*).

**B.     *Bruen* Test**

"Even if *Vongxay*'s analysis is too thin to render it controlling law post *Bruen*, its conclusion that [Section] 922(g)(1) passes constitutional muster remains sound under the new test." *Gamble*, 2023 WL 6460665, at *3; *see also Lair*, 697 F.3d at 1207 (instructing courts to consider an intervening authority's reasoning and analysis, even if prior precedent has not been abrogated). Proceeding under this assumption, the Court will assess Section 922(g)(1) under each step of the *Bruen* test in turn.

### 1.     Plain Text of the Second Amendment

The Second Amendment enshrines "the right of the people to keep and bear Arms," U.S. Const. amend. II; however, that right "is not unlimited," *Heller*, 554 U.S. at 626. The government argues that felons are not afforded Second Amendment protections because their prior convictions inherently disqualify them from being "law-abiding citizens." (ECF No. 30 at 8-11.) Alvarez-Mora counters that individuals with felony convictions are part of 'the people' to whom the Second Amendment extends and thus are covered under its plain text. (ECF No. 28 at 8-11.)

The Supreme Court has not yet explicitly delimited the scope of 'the people' whom the Second Amendment protects. *See United States v. Sitladeen*, 64 F.4th 978, 984 (8th Cir. 2023). The Court's decision in *Heller* indicated that 'the people' may have the same meaning under the First, Second, and Fourth Amendments, and therefore the right to bear arms presumptively extends to "all members of the political community, not an unspecified subset." 554 U.S. 570, 580-81 (2008) (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). A plurality of the Court seemed to reaffirm that the Second Amendment must be interpreted in line with other individual constitutional rights two years later when it rejected the idea that the right to keep and bear arms is "a second-class right, subject to an entirely different body of rules than the other Bill of Rights

guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion); *accord Bruen*, 597 U.S. at 70. At the same time, the Court has also implied that the Second Amendment right is not universal, as longstanding prohibitions on firearms possession by "felons and the mentally ill" are presumptively valid. *Heller*, 554 U.S. at 626 & n.26; *accord McDonald*, 561 U.S. at 786 (plurality). Given these "conflicting pronouncements," *Heller*, 554 U.S. at 644 (Stevens, J. dissenting), it is unclear whether the repeated references to "law-abiding citizens" in the Supreme Court's Second Amendment jurisprudence[2] are meant to refer to only the core Second Amendment right or define the right's entire scope, *see Antonyuk v. Chiumento*, 89 F.4th 271, 312-13 (2d Cir. 2023); *see also Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023) (finding that *Bruen* left "unresolved" the "complicated issue" of whether the plain text of the Second Amendment covers felons).

Post-*Heller*, the Ninth Circuit has suggested that Second Amendment rights may not extend to persons convicted of felonies. *See Vongxay*, 594 F.3d at 1115 ("[F]elons are categorically different from the individuals who have a fundamental right to bear arms."); *id.* at 1115 n.1 (noting that Justice Stevens' dissent underscored that the *Heller* majority limited the Second Amendment's protected class to "law abiding, responsible citizens").[3] Though the Ninth Circuit has not weighed in on this issue again after *Bruen*, other judges in this district have found that *Bruen* "reinforces *Heller*'s conclusion that individuals with felony convictions fall outside the scope of the Second Amendment's protections." *Gamble*, 2023 WL 6460665, at *4; *see also Teter*, 76 F.4th at 949 n.9 (declining to address whether criminals are included in 'the people').

However, given the large and complicated constitutional questions in this field and the ambiguity of controlling precedent, the Court will assume, without deciding, that

---

[2] *See, e.g., Heller*, 554 U.S. at 625, 635; *McDonald*, 561 U.S. at 790; *Bruen*, 597 U.S. at 9, 26, 29-31, 38, 60, 70-71.

[3] The Court's analysis under the *Bruen* test presumes that *Vongxay* has been abrogated. Even if the ultimate holding of *Vongxay* were abrogated, *Bruen* did not reject the accuracy of *Vongxay*'s analysis of the Second Amendment's text. The Court thus finds it instructive, at minimum.

persons with felony convictions fall within the scope of the Second Amendment Right as articulated under *Heller*, *Verdugo-Urquidez*, and *Bruen*. *See United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019) (declining to determine whether the Second Amendment extends to unlawfully present immigrants because the state of the law precluded a definite answer).

### 2. 'Historical Tradition' Test

Regardless, Section 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. For the Court to uphold Section 922(g)(1), the government must demonstrate that the provision has a "well-established and representative historical analogue," though they need not identify a "historical twin." *Id.* at 30. Two central inquiries in determining whether Section 922(g)(1) and historical gun ownership restrictions are "relevantly similar" are whether Section 922(g)(1) and historical restrictions "impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Id.* at 29. This analysis must also be undertaken in light of the Supreme Court's repeated instructions that the "longstanding" restrictions on felons possessing firearms are "presumptively" valid. *Heller*, 554 U.S. at 626-27 & n.26; *accord McDonald*, 561 U.S. at 786 (reiterating this point); *see also Presumption*, Black's Law Dict. (10th ed. 2014) ("A presumption shifts the burden of production or persuasion to the opposing party."); *Godoy v. Spearman*, 861 F.3d 956, 965 (9th Cir. 2017) ("[A] presumption can be rebutted only by contrary evidence."). Below is a rendition of the most relevant history. *See Bruen*, 597 U.S. at 34-38 (noting that historical evidence near in time to the amendment's adoption in 1791 is the most illuminating as to the scope of the right).

During the Founding era, it was well understood that the government could disarm those who did not comply with certain communal obligations and abide by the norms of civic society. *See Vongxay*, 594 at 1118 (noting that the majority of historians agree that

right to bear arms was tied to virtuous citizenry);[4] *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023). Notably, Connecticut enacted a law in late 1775 mandating that any person convicted of libeling or defaming the acts of the Continental Congress or Connecticut General Assembly "shall be disarmed and not allowed to have or keep any arms."[5] (ECF No. 30 at 15.) Relative to Section 922(g)(1), this Connecticut law imposed comparable burdens on firearms possession, with comparable justifications. *See Bruen*, 597 U.S. at 29. Both Section 922(g)(1) and the Connecticut law completely restrict access to guns after a conviction for a specific class of crimes, and both were enacted due to the legislatures' views that committing the identified crimes indicated the person might pose a danger to society if armed. Though not historical twins, the two are distinctly and relevantly similar. The subsequent enactment of more analogous restrictions on felons' gun rights is not dispositive, as "it is not necessary that [Section] 922(g)(1) have a historical twin, just that there is an analogous precursor." *Gamble*, 2023 WL 6460665, at *4 (footnote omitted).

Alvarez-Mora argues that the Connecticut law is materially different from Section 922(g)(1)'s lifetime ban because it allowed an "inimical" individual to restore his rights once "he could prove his friendliness to the liberal cause." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 269 (2020) (quoting G.A. Gilbert, *The Connecticut Loyalists*, 4 AM. HIST. REV. 273, 282 (1899)). But this argument is misplaced. The Connecticut law divided Loyalists into three categories, each with its own restrictions on firearms possession: (1) persons who aided the British; (2) persons convicted of defaming the resolves of Congress or acts of Connecticut; and (3) persons reported to local authorities as 'inimical.'

---

[4] The Court's analysis under the *Bruen* test presumes that *Vongxay* has been abrogated. Even if the ultimate holding of *Vongxay* were abrogated, *Bruen* did not reject the accuracy of *Vongxay*'s historical analysis. The Court thus finds it instructive, at minimum.

[5] An Act for Restraining and Punishing Persons Who Are Inimical to the Liberties of This and the Rest of the United Colonies, and for Directing Proceedings Therein (Dec. 1775), *in* 15 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT [1636-1776] 193 (C.J. Hoadly ed., 1850), perma.cc/2F8V-S9JF.

*See* G.A. Gilbert, *The Connecticut Loyalists*, 4 AM. HIST. REV. 273, 282 (1899). While a person of the third class "would be disarmed until such time as he could prove his friendliness to the liberal cause," anyone of the second class—the provision of the law upon which the Court relies—"could keep no arms" and was not afforded a means to restore that right. *Id.*; *accord* An Act for Restraining and Punishing Persons Who Are Inimical to the Liberties of This and the Rest of the United Colonies, and for Directing Proceedings Therein (Dec. 1775), *in* 15 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT [1636-1776] 193 (C.J. Hoadly ed., 1850). Thus, the conclusion that both laws similarly burdened the right to bear arms by imposing a lifetime ban on firearms possession still stands.

Moreover, this Connecticut law was not an outlier. *Cf. Bruen*, 597 U.S. at 65-66, 70. The majority in *Bruen* rejected the Texas Supreme Court's interpretation of the Second Amendment after the Civil War as a "late-in-time" outlier because it "contradict[ed] the overwhelming weight of other evidence" regarding the understanding of the scope of the right. *Id.* at 66, 70. The Connecticut law, in contrast, is from the most historically relevant time period and does not evince a fundamentally different conception of the right to bear arms than its contemporaries.

Disarming those who violated statutes requiring an affirmation of loyalty to the American colonies was commonplace. A few months after the Connecticut law's enactment, the Continental Congress passed a resolution recommending that the colonies disarm all persons "who are notoriously disaffected to the cause of America" or who refused to associate with the American military in the Revolutionary War.[6] (ECF No. 30 at 15.) Several individual states subsequently passed laws requiring their citizens to swear oaths of loyalty to the state and disarmed those who did not comply.[7] (*Id.* at 15-

---

[6]Resolution of March 14, 1776, *in* 4 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789 205 (Worthington Chauncey Ford ed., 1904), perma.cc/6XMF-DDY9.

[7]*See e.g.*, 5 ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY 479 (1886), perma.cc/94L8-VKLT (disarming any man in Massachusetts who did not sign a loyalty oath); Act of June 13, 1777, § 1 (1777), *in* 9 THE

16.) In North Carolina, for example, anyone who did not give the mandated affirmation of loyalty lost their right to "keep Guns or other Arms within his or their house."[8] (*Id.* at 15-16.) Taken together, these acts evince a historical understanding among American colonists that the right to bear arms—whether derived from the common law or state constitutions[9]—did not preclude the government from disarming persons who violated the law. That disarmament was focused on a single class of legal violations does not substantially undermine the loyalty-oath statutes' analogical fit to Section 922(g)(1), as it likewise focuses on a single, albeit larger, class of violations.

This idea that it was acceptable for the government to disarm those who more broadly did not comply with the rules of society is also bolstered by the ratification debates. Two state conventions suggested that the Constitution should include a limited right to bear arms. (ECF No. 30 at 19.) The Pennsylvania minority dissent to the ratification of the Constitution recognized that citizens had a right to bear arms "unless for

---

STATUTES AT LARGE OF PENNSYLVANIA FROM 1652-1801 110, 112-13 (William Stanley Ray ed., 1903), perma.cc/K4SH-4M7S (disarming all white men living in Pennsylvania who did not swear allegiance to the state); An Act for Constituting a Council of Safety, *in* ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF NEW-JERSEY AT A SESSION BEGUN ON THE 27TH DAY OF AUGUST, 1776, at 90 (1777), perma.cc/GM48-QN3M (disarming persons deemed "disaffected and dangerous to the present Government"); 7 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 567 (John Russell Bartlett ed., 1856), perma.cc/B933-GHGU (confiscating the "arms, ammunition, and warlike stores" of any person in Rhode Island who refused to pledge loyalty to the American colonies); An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiances to the Same, and for Other Purposes (1777), LIBR. OF CONG., perma.cc/F9FN-NAAP (disarming "'all free born male inhabitants" of Virginia who refused to swear their "allegiance and fidelity' to the state").

[8]An Act to Amend an Act for Declaring What Crimes and Practices Against the State shall be Treason, and What Shall Be Misprison of Treason, and Providing Punishments Adequate to Crimes of Both Classes, and for Preventing the Dangers which May Arise from Persons Disaffected to the State, *in* 24 ACTS OF THE NORTH CAROLINA GENERAL ASSEMBLY, 1777, at 89 (1777), perma.cc/S7KP-8X8C.

[9]The oath-based disarmament statutes from Massachusetts, North Carolina, and Pennsylvania are particularly instructive, as each state's constitution contained an individual right to bear arms before their passage. (ECF No. 30 at 16 n.4 (citing individual provisions of each state's constitution)). *See also Heller*, 554 U.S. at 601. Other states' laws are still relevant, as they support the idea that the American colonists understood the pre-existing common law right to bear arms could be burdened in this manner. *See Bruen*, 597 U.S. at 26, 34, 39 (noting that the Second Amendment codified the pre-exiting English common law right to bear arms).

10

crimes committed, or real danger of public injury."[10] (ECF No. 30 at 16, 19.) Though it was not an adopted law, *Heller* recognized that this report was a "highly influential" "precursor" to the Second Amendment. 554 U.S. at 604. The New Hampshire delegation's proposal—upon which *Heller* also relied, *see* 554 U.S. at 604—recommended amending the Constitution to provide that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion,"[11] (ECF No. 30 at 16-17). In the Massachusetts convention, Samuel Adams proposed recommending an amendment to the Constitution that would prohibit Congress from preventing "peaceable citizens" from keeping arms.[12] (*Id.* at 19.)

Though these proposals were not codified, they are still illuminating as to the scope of the right to bear arms. "'[E]xamination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification' [is] 'a critical tool of constitutional interpretation.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (emphasis removed). *Heller* itself extensively reviewed non-legal historical sources—including Founding era legal writings and post-Civil War public discourse, Congressional debates, and legal writings, *see id.* at 21 (discussing *Heller*, 554 U.S. at 605, 614, 616-19)—to confirm what the Court had already found established by historical law, *id.* at 37. So too this Court looks to the ratification debates as evidence of the historical understanding of the pre-existing common law right to bear arms which was codified in the Second Amendment. *See id.* at 26, 34, 39.

"Historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to

---

[10] Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, 1787, *in* BERNARD SCHWARTZ, 2 THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971).

[11] 1 DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (Jonathan Elliott ed., 1836), perma.cc/9BPC-ABLA.

[12] DEBATES & PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS, HELD IN THE YEAR 1788, AND WHICH FINALLY RATIFIED THE CONSTITUTION OF THE UNITED STATES 86 (1856), perma.cc/P9EM-4P2L; *see also* Massachusetts Ratifying Convention: Commentary, *in* SCHWARTZ, *supra* note 10, at 674-75, 707.

interpret it." *McDonald*, 561 U.S. at 803-804 (Scalia, J., concurring). But the weight of the evidence before the Court supports a finding that Section 922(g)(1) is "consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. Especially given the Supreme Court's instruction to view laws like Section 922(g)(1) with a presumption of validity, the government has met its burden of showing that the United States has a tradition of disarming persons who demonstrate an unwillingness to comply with societal rules and norms by violating the law. *See Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 561 U.S. at 786.

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion, as they do not affect the outcome of the motion before the Court.

It is therefore ordered that Defendant Colby Vega Alvarez-Mora's motion to dismiss (ECF No. 28) is denied.

DATED THIS 15th Day of April 2024.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE